UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

In re:

BENDER SHIPBUILDING AND　　　　　　　　　　　　Case No. 09-12616-MAM
REPAIR CO., INC.,

    Debtor.

BENDER SHIPBUILDING AND
REPAIR CO., INC.,

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　　Adv. Proc. No.: 11-00102

ANALYTICAL CHEMICAL AND
TESTING INC.,

    Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART ANALYTICAL CHEMICAL AND TESTING, INC.'S MOTION FOR SUMMARY JUDGMENT**

Eric J. Breithaupt, Attorney for the Plan Administrator, Birmingham, Alabama
Nathan P. Friedlander, Attorney for Analytical Chemical and Testing, Inc., Mobile, Alabama

This case is before the court on Analytical Chemical and Testing, Inc.'s Motion for Summary Judgment. The court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. The court has the authority to enter a final order pursuant to 28 U.S.C. § 157(b)(2). For the reasons detailed below, Analytical Chemical and Testing, Inc.'s Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

1

FACTS

Bender Shipbuilding and Repair Co., Inc. ("Bender") was the subject of an involuntary petition for relief on June 9, 2009. Bender was unable to pay any of its debts as they came due on the petition date and was hopelessly insolvent. On July 1, 2009, Bender consented to the bankruptcy filing and the case was converted to a Chapter 11. Bender's Chapter 11 plan was confirmed by order of this court on December 9, 2010 and Scouler & Company was appointed as Plan Administrator. The Plan Administrator was authorized to pursue certain litigation claims, including avoidance actions, on the behalf of Bender. In the interests of brevity and clarity, the Plan Administrator will be referred to as "Bender" for purposes of this Opinion.

Bender filed this adversary proceeding on June 8, 2011 seeking recovery of certain prepetition transfers from Bender to Analytical Chemical and Testing, Inc. ("ACT"). The transfers in question total $28,627.50. Bender alleges that the transfers were preferential pursuant to 11 U.S.C. § 547 as they were made during the 90 days preceding the June 9, 2009 petition date. The parties exchanged discovery and, on August 1, 2012, ACT filed this motion for summary judgment. In support of its motion, ACT filed the affidavit of Robert Naman ("Mr. Naman"), founder, principal stockholder, and Chief Operating Officer of ACT. Bender responded in opposition to ACT's motion for summary judgment on August 2, 2012. This Court heard oral argument on August 31, 2012 and took the matter under advisement.

As its name suggests, ACT is in the business of chemical testing and analysis. ACT provided Bender with reports used to maintain compliance with federal and state regulations (like the Clean Water Act, 33 U.S.C. § 1251 et seq.) and to obtain necessary permits. Mr. Naman testified in his affidavit that the reports ACT provided to Bender were necessary to avoid enforcement actions from the Alabama Department of Environmental Management (ADEM).

Despite Mr. Naman's statement, no critical vendor motion was filed by Bender on behalf of ACT in Bender's bankruptcy case.

Bender and ACT's business relationship has spanned the last 23 years and, during that time, Bender and ACT have conducted business on a credit basis. Bender's principal, Tom Bender, and Mr. Naman have enjoyed a "long standing personal relationship" extending back to childhood, according to Mr. Naman. Mr. Naman stated that he was "never worried about the length of time it took [Bender] to pay" because Tom Bender gave him personal assurances that ACT would be paid. Moreover, Mr. Naman said that ACT was "willing to continue performing work for [Tom Bender] even when some invoices were long outstanding." In line with that testimony, ACT would often accept payments on invoices 80 to 150 days in arrears from Bender. Mr. Naman explained that "[t]ypically ACT would hold current reports until [Bender] paid outstanding invoices" and that Bender's payments were generally dependent on available cash flow. Mr. Naman also stated that the flexible credit payment arrangement between ACT and Bender was typical of all of Bender's trade vendors.

Attached to Mr. Naman's affidavit, ACT included a pay history spreadsheet (the "spreadsheet") between Bender and ACT detailing services provided to Bender from May 23, 2007 to May 6, 2009. Of the invoices paid during the preference period, every invoice was at least 100 days overdue. One of those invoices was 359 days overdue. Only 44 of the 135 (33%) invoices on the spreadsheet which were paid before the preference period were 100 or more days outstanding. The invoices paid from July of 2007 through June of 2008 were outstanding an average of 59 days. The invoices paid within the preference period were outstanding an average of 145 days. The invoices paid in mid to late 2008 and early 2009 were paid later than those paid in early 2008 and 2007.

3

LAW

A motion for summary judgment is controlled by Rule 56 of the Federal Rules of Civil Procedure, which is applicable to bankruptcy proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure. A court shall grant summary judgment to a moving party when the movant shows that "there is no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056(c). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2502, 91 L.Ed. 2d 2020 (1986), the Supreme Court found that a judge's function is not to determine the truth of the matter asserted or weight of the evidence presented, but to determine whether or not the factual disputes raise genuine issues for trial. *Anderson*, 477 U.S. at 249-50. In making this determination, the facts are to be looked upon in the light most favorable to the nonmoving party. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed. 2d 265 (1986); *Allen v. Bd. Of Public Educ. for Bibb County*, 495 F.3d 1306 (11th Cir. 2007). The moving party bears the burden of proving there is no issue as to any material fact and that judgment should be entered as a matter of law. Fed. R. Bankr. Pro. 7056.

In this adversary proceeding, Bender alleges that ACT received payments during the preference period that are avoidable pursuant to 11 U.S.C. § 547(b). Section 547(b) allows a trustee (or debtor in possession) to avoid any transfer of an interest of the debtor in property that is:

> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made--

4

> (A) on or within 90 days before the date of the filing of the petition; or
>
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if--
>
> > (A) the case were a case under chapter 7 of this title;
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

ACT acknowledges that Bender can make a prima facie case that the payments in question were preferential within the meaning of § 547(b). The payments received by ACT during the preference period total $28,627.50 according to Bender's complaint.

ACT's motion for summary judgment asserts three defenses to Bender's preference allegations: (1) the new value defense (11 U.S.C. § 547(c)(2)); (2) the ordinary course of business defense (11 U.S.C. § 547(c)(4)); and (3) the judicially-created critical vendor defense. In order to prevail on summary judgment, ACT must prove that no genuine issue of material fact exists as to its defenses and that it is entitled to judgment as a matter of law. Each defense will be discussed separately.

1.

The first defense asserted by ACT is the subsequent new value defense codified at 11 U.S.C. § 547(c)(4). Section 547(c)(4) states that the trustee may not avoid transfers that were subsequently followed by extensions of unsecured new value. Courts in the Eleventh Circuit require that the creditor "(1) have received a transfer that is otherwise avoidable as a preference under § 547(b); (2) have advanced new value to the debtor on an unsecured basis; and (3) the

5

new value must remain unpaid as of the filing date of the bankruptcy petition." *In re Jet Florida System, Inc.*, 841 F.2d 1082, 1084 (11th Cir. 1988). Importantly, the new value extended must be subsequent to the preferential payment. *In re Schabel*, 338 B.R. 376, 380 (Bankr. E.D. Wis. 2005).

The parties do not dispute that ATC is entitled to a new value defense. According to ACT's calculations, which are undisputed by Bender, after the appropriate new value credits are applied to the preferential payments, a $15,548 net preference remains. Therefore, ATC is entitled to summary judgment on that issue. ACT is obligated to turn over to Bender at most $15,548.

2.

The second defense relied upon by ATC is the ordinary course of business defense from 11 U.S.C. § 547(c)(2). Section 547(c)(2) allows a creditor to keep transfers made within the ninety-day preference period to the extent those transfers were in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and

>   (A)   made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
>   (B)   made according to ordinary business terms.

"The purpose of the ordinary course of business defense is to 'leave undisturbed normal financial relations.'" *In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir. 1986).

The parties agree that the transfers in question were "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee." Accordingly, only the applicability of subsection (A) or (B) is at issue. "Subsection [A] involves a subjective analysis of the course of dealing between the two parties to the suit; while

subsection [B] involves a broader objective inquiry." *In re Globe Holdings, Inc.*, 366 B.R. 186, 195 (Bankr. N.D. Ala. 2007). Either subsection (A) or subsection (B) may be proven.

As to subsection (A), "a peculiarly factual analysis" is necessary. *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991). Subsection (A) is often deemed the "subjective prong" because it looks at the specific course of dealing between the parties at issue. *In re Samy Santa Flooring Depot, Inc.*, 2011 WL 873440, at *3 (Bankr. N.D. Ga. March 14, 2011). Late payments are not automatically outside the ordinary course of business between parties. *In re Braniff*, 154 B.R. 773, 780-81 (Bankr. M.D. Fla. 1993). However, it must be shown that it was the parties' ordinary custom to pay late. *Id.* The gravamen of subsection (A) is whether the transactions between the parties were consistent both before and during the 90 day preference period. 5 *Collier on Bankruptcy* ¶ 547.04[2][a] (16th Ed. 2011); *In re Moltech Power Systems, Inc.*, 327 B.R. 675, 682 (Bankr. N.D. Fla. 2005) ("[A] lack of consistency between pre-preference and preference period transactions indicates that the latter were not made within the ordinary course of business.").

ACT argues that the payments made during the preference period were in accordance with prior dealings between the parties, which were based upon a flexible credit relationship. In support, ACT offers a two-year payment history spreadsheet and the affidavit of Robert Naman, its Chief Operating Officer. ACT argues that, even prior to the preference period, it was normal for ACT's invoices to remain outstanding for long periods of time. ACT claims that it was not unusual for the invoices to be paid 81 to 147 days late. As such, ACT asserts that the payments made during the preference period "fell within the normal range as reflected by the pre-preference transactions" and were, thus, ordinary between the parties. ACT further argues that if

7

you take out a few "aberrational" invoices, all of the invoices on the spreadsheet were paid at roughly the same rate.

Bender disagrees. Bender argues that the pay spreadsheet provided by Mr. Naman does not exhibit an ordinary payment history. Instead, the spreadsheet shows that over the first year, Bender paid ACT more promptly and consistently for its work. Later, however, as Bender became more insolvent, the payments to ACT came much later. Moreover, Bender argues that it is just as likely that ACT was paid during the preference period based upon the close relationship between Robert Naman of ACT and Tom Bender of Bender Shipbuilding rather than as a product of ordinary business relations.

This court agrees with Bender. A genuine issue of material fact exists with regard to whether the preference payments were made in the ordinary course of business as between the parties. Such a conclusion is typical with factually intensive inquiries like ordinary course of business. *In re Terry Mfg. Co., Inc.*, 358 B.R. 429, 435 (Bankr. M.D. Ala. 2006). The invoices paid over the first year of the two-year spreadsheet were paid much more regularly than the invoices paid during the preference period. Very few invoices paid prior to the preference period were over 100 days outstanding. In contrast, every invoice paid in the preference period was over 100 days outstanding and some were outstanding for much longer than that—the first preference payment made was on an invoice that had been outstanding for 359 days. The difference in duration is even more apparent when one compares the invoices paid from July of 2007 through June of 2008, which were outstanding an average of 60 days before payment, versus those paid during the preference period, which were outstanding an average of 145 days.

In *In re Homes of Port Charlotte, Florida, Inc.*, 109 B.R. 489, 490-91 (Bankr. M.D. Fla. 1990), the bankruptcy court found certain preference payments to be outside the ordinary course

8

of business because prior to the preference period creditor invoices were paid 28-76 days after the invoices were issued, but during the preference period, the payment delay increased to 63-109 days. According to that court, the inconsistency between the pre-preference period payments and those during the preference period doomed the ordinary course defense. The conclusion is similar here. The spreadsheet does not make clear that the payments made to ACT during the preference period were merely a continuation of ordinary business between the parties. Moreover, the "aberrational" invoices cannot be merely cast aside, as suggested by ACT, when determining ordinary course of business.

The ambiguity is compounded by the close friendship between Robert Naman and Tom Bender. Robert Naman testified that he did business with Tom Bender based upon personal assurances that he would be paid and claimed that he did not worry about being paid because he trusted Tom. It is not sufficiently clear that the payments made during the preference period were not based upon that close relationship rather than pursuant to the ordinary course of business. As such, ACT's summary judgment request pursuant to § 547(c)(2)(A) is denied.

ACT also argues that the payments made during the preference period were made according to ordinary business terms, satisfying subsection (B) of § 547(c)(2). "To satisfy the 'ordinary terms' requirement, the creditor must characterize the payment practices of its industry with specificity, and present specific data to support its characterization." *Globe Manufacturing*, 567 F.3d at 1299. ACT's motion fails to define the relevant industry for consideration under § 547(c)(2)(B). Further, the affidavit of Robert Naman fails to provide specific examples of how the business between Bender and ACT comports with that relevant industry's norms. No other evidence was presented to the court. Such an evidentiary showing is not sufficient to establish the absence of a genuine issue of material fact regarding whether ACT and Bender acted

9

according to ordinary business terms. As such, ACT's motion for summary judgment pursuant to subsection (B) is denied as well.

3.

ACT also argues that it is entitled to critical vendor status, which would arguably except the payments it received during the preference period from avoidance. In some cases, critical vendor motions are filed by debtors early in cases in order to obtain court permission to treat one or more creditors differently than other creditors by virtue of the necessity of those creditors' services. Due to this disparate treatment, such motions are carefully scrutinized and rarely granted. *In re Fultonville Metal Products Co.*, 330 B.R. 305, 313 (Bankr. M.D. Fla. 2005). Courts generally require an evidentiary showing in order to grant a critical vendor motion. One court required that: "(1) the payments were necessary to the debtor's reorganization; (2) that a sound business reason justified the payments, in that the vendors would refuse to do business with the debtor absent the payments; and (3) that the disfavored creditors would not be harmed by the payments." *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 17 (Bankr. M.D. Fla. 2005). The court in *Fultonville*, 330 B.R. at 313, explained that critical vendor motions should only be granted "when the circumstances establish that the selected payments are necessary to the reorganization case and will ultimately benefit all creditors of the estate."

ACT insists that it is a critical vendor. It claims that its reports were necessary to keep Bender in business because without them Bender could not have complied with necessary federal and state regulations and that such a failure would have resulted in enforcement actions. The affidavit of Robert Naman supports this assertion. ACT's argument fails for several reasons. First, no critical vendor motion was filed in Bender's bankruptcy case. Generally, those motions are filed at the inception of the case by debtors utilizing their business judgment. *Tropical*

*Sportswear*, 320 B.R. at 17-18. Second, ACT has not shown that even if a critical vendor motion had been filed that it would have survived objections or that this court would have approved it. Similarly, ACT has not shown that if it had not been paid the preferential payments, it would have been paid pursuant to a critical vendor motion. *See In re Zenith Industrial Corp.*, 319 B.R. 810, 814 (Bankr. D. Del. 2005). Third, ACT has failed to establish that it would have refused to do business with Bender without the preferential payments. In fact, the affidavit of Robert Naman indicates that he did not worry about being paid by Bender because of his friend Tom Bender's personal assurances. Fourth, there is no evidence that payment of ACT would not harm other disfavored creditors. With the insolvency of Bender in this liquidating case, that fact can never be proved. Other unsecured creditors will not be paid in full.

In short, ACT has not established that it is, or ever was, a critical vendor. The evidence supporting ACT's critical vendor defense falls woefully short of establishing the absence of a genuine issue of material fact regarding its efficacy.

IT IS ORDERED

1. ACT's motion for summary judgment is GRANTED as to its subsequent new value defense. ACT is liable for at most $15,548 in potential preference recovery;

2. ACT's motion for summary judgment is otherwise DENIED.

3. The underlying adversary proceeding is set for status on October 2, 2012 at 8:30 a.m.

Dated: September 13, 2012

*Margaret A. Mahoney*
MARGARET A. MAHONEY
CHIEF U.S. BANKRUPTCY JUDGE